Let's see, which one is this? Now I'm lost. It's Zamorano-Leyva.  Yes. Counsel, my name is Jack Lansdale. I represent the appellant Jaime Zamorano-Leyva. Yes. This is a fairly straightforward case, and I'm going to try to be brief. The concern that I have is, as I noted, the cases that were cited in the appellant's brief and the cases that were cited by the government, obviously we cited cases that involved findings of insufficient evidence, and the government cited cases where the requirement of the evidence was sufficient.  Our cases involved cases such as Vasquez Champ, which was cocaine found in a house where the defendants were defined as being a housekeeper as well as a visitor who had been there several days. There are two passenger cases where there are vehicles involved, but the defendants were passengers in the vehicle, and there was no indication of any evidence of direct involvement. Well, in this case, though, your client is the driver. He's a truck driver with, I think, over, was it 20 or 30 years of experience? 20 plus. Yes, and he acknowledged that he had checked the truck over, and that he always checks the trucks over to make sure that there's, he acknowledged that he actually opened the back door and looked inside? Correct. Okay. So we have all of that evidence out of his own mouth. Correct. Then we have the testimony of the Border Patrol agents who testified that you could smell the marijuana reeking out of this truck 10 to 15 feet away, that when one agent who was allergic to marijuana stepped inside, she broke out in hives. It was so concentrated, and that it was patently, essentially patently obvious that this truck was carrying marijuana. And he said, well, you know, I opened the back, and I didn't smell it. Correct. There's no testimony that he suffers from a medical condition which prevents him from having a problem detecting odors. So don't we have a credibility issue for the jury here? Well, we have a credibility issue, certainly. And they found against your client in half an hour. Well, I wasn't there. I didn't try the case. The record says a half an hour. I didn't know how long the verdict took. So we have the knowledge issue based upon the Border Patrol officers indicating that they could smell the marijuana. Even from the closed truck. Forget the open truck. I have the impression that it was the first officer opened the back, and that's when they first smelled the marijuana. I thought there was something in the record. Regardless, he admitted he opened the back. And he said he checked the truck. So we're kind of – we're – he doesn't seem to fall really in the category of somebody in the house or a passenger in the car. So how do you distinguish those cases where the knowledge is imputed because you have either ownership, dominion, keys to the vehicle, that sort of thing? Well, in the cases where knowledge is inferred, this is where I get a little bit confused and what I was going to mention. We have cases such as the Davila-Escobedo case where they have a whole lot of factors that are discussed. And then in concluding that there was sufficient evidence to go beyond the judgment of acquittal and go to the jury, they make a very simple finding. He's the driver and sole occupant of the vehicle. The jury could probably infer that he knew about the marijuana. Combined with the next sentence, which is, the mere possession of a substantial quantity of drugs was an inference of knowledge. So both of those factors have continuously been referred to in cases. The Diaz-Cardenas case also. Excuse me, counsel. I think that would be a fine argument if we were just assuming that all he did was, by his own admission, he gets across the border, he sneaks across the border, he goes to the station, jumps in the cab, and then just drives away. I think that you might be in a better position to suggest that he didn't have any direct knowledge, but you're dealing with imputed knowledge. Now, the circumstances of this case are different in that he acknowledged that he checked the truck over. He acknowledged that he opened the back of the truck and looked inside. Okay. And then we have testimony from the several border patrol agents as to the nature of the odor. So we're not talking about imputed knowledge here. We're talking about credibility as to direct knowledge. And there's a big difference between imputing and direct. And the jury had his testimony in front of them, and they had the border patrol agent's testimony in front of them. And they decided to believe the border patrol agents and not him. So we're really not talking about imputed knowledge, as Judge McKeown had suggested, because she's talking about somebody who just jumps in the back of the car, and I agree with her wholeheartedly. If somebody jumps in the back of a car and they don't know what's going on, you would have to impute the knowledge that there was something, you know, in the carburetor or under the car or something to these otherwise innocent people or people we assume are innocent under the law. But in this case, we have him actually opening the back. Correct. Well, and we're not disputing that the trained border patrol agent didn't recognize the smell of marijuana. Mr. Zamorano-Leyva testified that he had never smelled raw marijuana before. He had smoked marijuana about 20 years before and recognized the smell of burning marijuana. Sorry. Well, isn't this a common-sense factor for the jury? I mean, I've never smoked marijuana in my life, but I can sure tell you what it smells like, because I was a college student in the days when it was puffed around the campus, as some of my colleagues here were. We won't ask him if he inhaled it. I never smoked it. I'll say that on the record. But I sure smelled it, and I can tell you I know what it smells like. And, you know, isn't that something that the jury can, you know, a credibility? Here's a guy who lives in Mexico who admitted he smoked marijuana at some point who later says, gee, I don't know what it smells like, when it was so strong that people could smell it from 15 feet away? Well, burning marijuana. Well, you have to light it up in order for it to burn. It doesn't start burning on its own, I would think. I understand that, but I've been ---- It's the Moses with the burning bush here. I've been in the courtroom back in the old days when they actually wheeled the hundreds of pounds of marijuana into the courtroom. Well, I've been in the new days when they've wheeled it in. And it smells ---- The odor of the marijuana piled up is a lot different than the burning smell. I understand. But I'm happy to say it's a credibility issue, it looks to me like. Well, as to the defendant's testimony, I might point out that he did explain when the government ---- I don't know how much time I've got left, but when the government pointed out inconsistent statements that he had made, when he explained his side of the story, it all made sense because he explained that he normally worked for Gallego Trucking. His truck that he normally drove was broken down for a couple of days, so he had gone across the border and was sitting at that location trying to get a ride back to Obregon when he was approached by this gentleman for a one-shot deal. His side job was really what it boiled down to. Thank you. Can I just ask you one question? It doesn't have to do with your case, but we've had some questions on the problems with the clock. Is that clock working right now? Is it right in front of you, the timing clock? No. Yes. Okay. I just wanted to make sure that it was working. No, I'm a lot ---- Most people don't. You know what? The problem is it's over here and you're talking to us. So I just wanted to make sure it was still working. So thank you very much. It says 57 seconds. Well, you have a little more than that if you need it. That's fine. Thank you very much. Good morning. May it please the Court. Celeste Corlett, Assistant United States Attorney, here on behalf of the United States. There was sufficient evidence to convict the defendant of possession with intent to distribute 3,155 pounds of marijuana. There are at least seven areas of evidence of the support that the defendant knew that he possessed marijuana. There was dominion and control, the value and amount of marijuana, the overwhelming smell of marijuana, the defendant's inconsistent stories, the sham company that he claimed he was working for, the defendant did not act as a reasonable driver, and the defendant's lack of credibility. First under dominion and control, the defendant was the driver of the vehicle, he was the sole occupant of the vehicle, and he had access to the marijuana. He admitted when he first picked up the vehicle, he opened the back of the vehicle, so he had access to where the marijuana was stored. And additionally, when the agent, when he was stopped at secondary, they went to the back of the vehicle to open it. The agent testified there was no lock on that door. It was just a latch that you simply open. So he had access, he had complete dominion and control over the marijuana, and the jury conferred knowledge that he possessed the marijuana. Additionally, the value and amount of marijuana. This was 3,155 pounds of marijuana. Even in southern Arizona where we see large quantities of drugs, this was a huge amount. The agents had admitted this was the largest seizure they had made at that checkpoint where they saw thousands of cars. Also, the value of marijuana was over $1 million. The owner of the marijuana was not going to be trusted to an unknowing driver, especially a truck driver who has a higher standard of knowing what is in his vehicle. And, again, the jury could infer knowledge based on the value and amount of drugs. You're suggesting that they wouldn't just take somebody's doon, so to speak. Exactly. Because their fear would be, I guess, that the person would smell it or check the truck out and go, oh, my goodness, there's marijuana in here, and then drive the truck to the police? Exactly. Especially with this large amount of marijuana that the smell was so overwhelming, the reasonable truck driver would have smelled the marijuana, either abandoned the load, not gone forward with transporting that and leaving $1 million on the side of the road, or he would have called the police. He would have been a reasonable person and called the police and said, I smell marijuana in this. I don't want to be responsible for this. I don't want my trucking license to be taken away. So a reasonable person or, I'm sorry, the owner of those drugs would have known that, or would not have entrusted it to an unknown driver, considering that they could have lost $1 million worth of drugs. He was also quite vague about the deliveries of the, according to whom the delivery was supposed to be made, wasn't he? Exactly. And that was part of his inconsistent stories and his credibility that the jury could have found he was not credible. He had three different stories of how he obtained it, where he was supposed to take it, and the stories basically kept changing even at trial. The more the government asked him specifics, the more he would just add to the story, add to the story, and his inconsistencies just grew. Initially he had said that he was going to take it to a place in Tucson on Miracle Mile. He couldn't describe where. He couldn't describe how he was going to get there. He didn't have the number of the location where he was going to take it, the name of a person he was to deliver it to. He didn't know the name of the person he obtained the drugs from. He didn't have a phone number. He was specifically asked if you had broken down on the freeway on this drug. I mean, remember, this is in the middle of the desert, in the middle of the summer, in the very hot season. If he had broken down, who was he going to call to tell them, I've broken down, I can't make the load? He didn't have that information. That was not what a reasonable truck driver especially would have, and that also goes to his credibility. And as to the overwhelming smell, the third area, as I said, this is 3,155 pounds. And if we can have the setting for you, this was in July in the desert. The agents have testified it was very, very hot that day. The agents who are normally in the desert working at the checkpoint, they testified on that particular day it was very, very hot. He picked up the drugs from his testimony about 5 p.m. He drove them for about an hour until 6 p.m. when he was stopped at the checkpoint. So those 3,000, over 3,000 pounds of marijuana are in this metal box. It's not refrigerated. It's basically, as the agent testified, cooking as he's driving from Nogales to the Rio Rico checkpoint. It's even building up more of a scent. It's saturating the air, as the agent had testified. A little like compost, huh? Exactly. And then he claims when he opens it that there was a gust of hot air that came out. He claims when he picked it up, he wasn't claiming it was in a refrigerated area or it was in the shade, but rather when he opened the doors, a gust of hot air came out, but he claimed he didn't smell the marijuana. And even when he gets to the checkpoint, when the agent has him open the drugs after it's been sitting, we know, for an hour in the truck, baking in the truck, 3,000 pounds, they open the doors. She right away says it's an assaultive, the smell of the marijuana. He says he can't smell the marijuana. The agents testified before they even reached the truck, they can smell the marijuana. It's assaultive. It's overwhelming. The K-9 dragged the agent there. He hadn't even directed him to start searching. The K-9 was dragging the agent, alerting all the way. Ten feet away, the dog is already aware of the smell. He jumps in the truck without being commanded to and keeps alerting and keeps alerting. This was a huge amount, and as Your Honor had pointed out earlier, he had the agent who was allergic to the touch of marijuana. When she got into the truck, just the fumes alone started her itching and having hives because it was so overwhelming. Everyone agreed it was an overwhelming smell, and the defendant continued to maintain he could not smell it, even at the checkpoint. And his maintaining that he couldn't smell the marijuana, the jury could have found unbelievable and contributed to their finding of guilt. And as we discussed also, the defendant had inconsistent stories from which the jury could infer a consciousness of guilt. He had at least three different stories. He even admitted to the agents. He had told Border Patrol one story. He told the DEA essentially the same story. And then when he's right before he's going to be taken into the custody of the marshals, he tells the DEA, I lied before. I lied to Border Patrol. I lied to you. And the truth of the matter, it's a different story. It's the company I usually work for. That's who hired me. He even admitted that he lied. And he claimed on the stand the reason he lied was he didn't want that company to believe that he was trafficking drugs. But he admits that he's lying all along the way. And when he tells the marshals, he says, it was Gallegos. And I will tell you more after I get my attorney. And the more he said was just that it was not Gallegos. Then he gets on the stand and changes his story again. It was not Gallegos Trucking. It was this other company. I don't know their name. I don't know who they are. And, again, if the defendant was disbelieved at trial, that's consistent with the finding of guilt. The fifth item was that this was a sham company he worked for. That was also very significant, especially for a truck driver working 20 years in that area. He's familiar with the truck drivers. He's familiar with the companies out there. This company that he claimed for, there was no evidence that it even existed. The agent had testified he had contacted Intel, who had information on commercial vehicles. No information about that company. There was no phone book ad for the company. The address that the license plate was registered to, the person had not lived there for a year. There was the defendant himself had said he had no phone number, no name, no address for this company. And, again, that undermines the legitimacy of his actions. And as we discussed briefly also, he wasn't acting as a reasonable truck driver. He didn't have any information about the company he was working for, where he was going to deliver this to, how he was going to reach them. And also, as you had mentioned, he carefully checked everything on the outside of the truck, the flaps, the oil, the gauges. And he said because he didn't want police to stop him. They had noticed something wrong with the truck. But when he opens the back of the truck, he just looks inside. He doesn't check to be sure it's secure. He doesn't have any paperwork indicating to him what it is that he's transporting. And instead of being just as careful on the inside of the load, being responsible for what he's transporting inside the United States, he was not careful at all. And finally, the defendant's lack of credibility. The jury could infer a guilty mind. All of those things we've discussed combined. The unbelievability that he could not smell the over 3,000 pounds of marijuana, his different stories, his continuing to add to the stories during trial, and not acting like a reasonable truck driver. The jury could find him unbelievable, which was consistent with the verdict of guilty. So, Your Honors, viewed in the light most favorable to the government, I'm sorry, to sustaining the jury's verdict, the government presented ample evidence to support a guilty verdict in this case. Thank you. Do you have any rebuttal? All right. Thank you very much to both counsel. The case of United States v. Zamorano-Leyva is submitted. We'll now hear argument in United States v. Salvador Gonzalez. Thank you.
judges: Hug, McKeown, Ezra